## KLAUER v. WESTERN METAL SPECIALTY CO. et al.

(Circuit Court of Appeals, Seventh Circuit. August 20, 1921.)

### No. 2866.

**Patents ⬅️328—Reissue 14,648, for charcoal burner, held not infringed.**

The Klauer reissue patent No. 14,648 (original No. 1,188,880), for a charcoal burner, adapted to generate carbon monoxid gas, which is the essence of the invention, in view of the prior art and proceedings in the Patent Office, is limited to the form of burner described and claimed. As so construed, claims 5, 7, 8, and 9 *held* not infringed.

Appeal from the District Court of the United States for the Eastern District of Wisconsin.

Suit in equity by William H. Klauer against the Western Metal Specialty Company and Julius J. Goetz. Decree for defendants, and complainant appeals. Affirmed.

Samuel W. Banning, of Chicago, Ill., for appellant.

F. C. Dennett, for appellees.

Before BAKER, ALSCHULER, and EVANS, Circuit Judges.

EVAN A. EVANS, Circuit Judge. The patent in suit, reissue No. 14,648, original 1,188,880, pertains to a "charcoal burner." Appellant's bill was dismissed in the lower court without opinion, and various defenses, including invalidity and noninfringement, are pressed. Both counsel agree that the ground for the lower court's decision is unknown to them.

While the subject matter of the patent is a charcoal burner it is suggested that "a charcoal burner and carbon monoxid generator" would be more descriptive. Claims 5, 7, 8, and 9 of the reissue patent are involved, and 5 and 7 read as follows:

"5. In a heater, in combination, a base portion, a fire pot spaced from said base portion, adapted to burn charcoal and provided with a grate and having a top closure portion provided with an inlet opening, a magazine communicating for discharge through the opening into the fire pot, and disposed with relation to said opening and with the grate of said fire pot in a manner to retard normal combustion for the purpose of producing carbon monoxid gas, a casing provided with outlet openings adjacent the top of the fire pot, and connecting the magazine and the base portion and provided with inlet openings at points adjacent the space below the fire pot and communicating therewith and with the space between the fire pot and the casing for communication both with the space above and below said fire pot, whereby air is supplied to the fire pot and also to the space between the fire pot and the casing to cool the outer wall of the former and also communicates with the space above the fire pot to be commingled with the carbon monoxid gas."

"7. A combined heater and carbon monoxid generator for the purposes herein set forth, comprising, a substantially inclosed vertical fire pot provided with an outlet for the products of combustion located in the upper portion thereof, a grate supported in said fire pot, a fuel magazine for feeding fuel into the fire pot, an outer casing provided with an inlet in its lower portion for supplying air to the fire pot and an exhaust opening for the products of combustion and air above said inlet and leading directly to the atmosphere, said casing surrounding the fire pot and spaced from the vertical side wall

of the latter to form an air passage exterior of the fire pot through which a portion of the air supplied by the inlet in said casing is diverted from the fire pot, the inlet and exhaust openings of the fire pot being within the casing and the inlet to the casing being of restricted capacity with respect to the passage through and around the fire pot, whereby a relatively restricted draft is produced in the fire pot, combustion in the fire pot is retarded and carbon monoxid is generated, which exhausts through the fire pot outlet into the surrounding air chamber and thence through the casing outlet directly into the atmosphere surrounding the casing."

Claim 5 of the original patent was identical with the above-quoted claim of the same number, save only that it contained the limiting clause referable to the fire pot and the casing as follows: "Said casing being spaced from the fire pot."

A serious attack is made upon the validity of the reissue patent, which, in view of our determination of the appeal, need not be considered. Whether the amendment to the specifications without a new verification is fatal, or whether the monoxid generator idea was conceived more than two years after the application was filed, are matters the effect of which we need not determine. Likewise questions presented involving the validity of the reissue patent because of the alleged defective affidavit which supported it we will pass over.

The original specifications, and the presentation of the matter to the Patent Examiner prior to August, 1915, suggested merely a type of carbon burner for use primarily in refrigerator cars. As such, it was not a pioneer. Burners that would long hold fire were by no means novel, and this structure was met by a well-developed art. Charcoal for various reasons was an ideal fuel in such burners.

Moreover, monoxid as a germ destroyer and as a fruit preserver was well known and commonly used. That a burner consuming charcoal could be made to give off carbon monoxid was, of course, also well known. In fact, monoxid is generally recognized as a product of fuel combustion which the manufacturers of charcoal burners must avoid. It is generated when undesired, is present to some degree in almost all instances where charcoal is consumed in slow burners. As carbon dioxid evidences complete combustion, so carbon monoxid evidences incomplete combustion. To create the latter, one should maintain a slow fire.

The patent was allowed in this case solely upon the asserted combination which operated successfully as a slow burner and as a producer of $CO_1$, a burner so constructed as to generate a somewhat even or regulated quantity of this gas and also to hold the fire for several days. As such, it was valuable to the shippers of fruit partly or nearly ripe, and which fruit was to be transported hundreds of miles. The proceedings in the Patent Office are instructive, and, we think, conclusive on the question of infringement.

After describing a burner of a particular type, appellant set forth many claims, all for a charcoal burner, and all of which were rejected. In the rejection, he acquiesced. Upon amendment, the Patent Office wrote:

"This invention appears to be distinguished from the prior art in the limitations that the fire box is provided with a top formed centrally with an

escape opening for the products of combustion, the converging portion of the magazine extending through said opening, and means for adjusting the fire box with respect to said escape opening may be varied, and should a claim be presented to this subject-matter it would probably be allowable. Other claims drawn to equivalent subject-matter and including the features by which air is fed to the fire box and the products of combustion are permitted to escape from the casing would also be allowable as now advised."

All the claims were thereupon withdrawn, and 12 new claims presented, all likewise dealing with a heater, none of them containing any reference to a monoxid generator. In presenting patentee's claims, his counsel argued:

"In reference to the application for patent for the Baxter car heater, it appears to me that one of the main merits of the heater has been entirely overlooked, and that is the fact that the heater is so constructed and the draft is let in below in such an indirect way that should the car be wrecked and turned over a dozen times, the heater will remain intact (will not come apart) and no fire will escape. * * *

"The second important feature is that it is possible to vary the depth or thickness of fuel on the grate surface, or, in other words, to vary the quantity of burning fuel, and at the same time decrease the draft in direct proportion to the quantity of fuel that is allowed to burn."

Most of the claims were thereupon disallowed; those purely descriptive of a particular type of burner shown in the specifications alone being allowed. On August 24, 1915, some two years five months, after the original filing of the application, reference was first made to the monoxid gas generating qualities of the burner, and the specifications were amended to include:

"Another object of the invention is to provide a heater or burner that will supply the desired amount of heat and at the same time generate and introduce into the car or the compartment in which the heater is placed, carbon monoxid gas to create a preservative effect upon the fruit or other perishable articles contained in the car or compartment.

"Still another object of the invention is the disseminating of a product of charcoal combustion (carbon monoxid gas) within a closed container, as a car body, for the purpose of retarding the ripening process by delaying the action of fermentation in the fruit or vegetable contents of the car or container."

Supporting the amended specifications and claims, applicant argued:

"Applicant's specific heater or apparatus for heating and disseminating carbon monoxid gas is new in the art to which it relates, and it is thought that this case, as now presented, avoids any conflict with the art cited by the Examiner."

To which the Patent Office replied:

"Claims 8, 11, 12 and 13 should set forth the means adapted to generate carbon monoxid gas and for the escape of said gas from the heater."

It is evident from the foregoing that a point was here reached in the presentation of this application for a patent wherein the applicant was emphasizing in his burner its qualities as a monoxid gas producer. The Patent Office in turn demanded that the burner be described with such particularity that it could definitely ascertain how the $CO_1$ was to be generated and how it would escape from the heater. Appreciating the fact that the application would only be allowed upon his dis-

closing the two important means in his burner for generating $CO_1$ and for its escape from the heater, he modified his specifications and rewrote his claims. That is to say, the means provided in applicant's burner for generating $CO_1$ and the means for its escape from the heater were detailed and specifically set forth.

Constructing a burner that differed but slightly, and perhaps not inventionally, from other burners, as burners, the means whereby $CO_1$ was generated and distributed were the life of the invention, especially in view of the fact that all such carbon burners, when well checked, could be made to generate and distribute $CO_1$.

In other words, in view of the demand of the Patent Office, and the acquiescence therein by applicant, as well as the disclosures of the prior art, the means for generating and distributing the $CO_1$ became the essence of the invention. Obviously, such means, under these circumstances, are not entitled to a broad range of equivalency. In view of the history of this application above related, the applicant knew, when he recited his means for generating and distributing $CO_1$, he was to be limited thereto.

Noninfringement is asserted because appellee's structure differs from appellant's, who described his burner as follows:

"Referring to the particular features of my device, which are instrumental in producing carbon monoxid gas, it will be noted that I have a combustion chamber which is entirely inclosed except that provision is made for free entrance of air below the reticulated bottom thereof and a restricted draft opening is provided at the top, which may be regulated to control the exhaust of gases therefrom.

"Oxygen is required to support combustion and enters below the reticulated bottom of the combustion chamber, and as it enters the combustion chamber and comes in contact with the burning charcoal, carbon dioxid is formed, and as it passes up through the burning charcoal, it unites with carbon and emerges from the surface of the burning charcoal in the form of carbon monoxid. If the combustion chamber were not closed and oxygen were supplied to the combustion chamber above the fuel surface, it would unite with the carbon monoxid or burn. To preserve the carbon monoxid, therefore, the combustion chamber is closed above the burning fuel, and the draft outlet is limited or arranged so as to permit escape of carbon monoxid from the combustion chamber and prevent entrance of oxygen thereto, and the carbon monoxid thus formed passes out through the openings into the compartment in which the heater is located."

True, this is but a preferred form. But in view of what has been said, in view of the prior art, in view of the language of the claims, and in view of the fact that patentee was obtaining a patent upon a type of carbon burner that was, so far as these claims are concerned, a producer and distributor of $CO_1$ in desired or predetermined quantities, the form described may well be the only type protected. And if doubt otherwise existed, it is removed by the claims. They are drawn to cover just what patentee described. The element "a substantially inclosed, vertical fire pot," etc., appearing in claims 7, 8, and 9, may, under the circumstances, we think, well distinguish appellee's structure.

Appellee insists that its burner is not a $CO_1$ generator at all, and never was so intended; that, so far as it is a burner generating $CO_1$

it is subject to objection. But as all such heaters do generate $CO_1$ under certain operations and conditions, and as appellee's will likewise do so, we may pass to the question of construction. Appellee's heater has, I think, no "inclosed vertical fire pot" as that term is used in the claims. The top of the fire box is composed of two plates, one being used as a baffle-plate. Means for avoiding fires are obviously desirable in a burner that must be subject to jars and unattended for days as these burners are. The baffle-plate is for that purpose. Perhaps there is a restricted escape of the products of combustion, but nevertheless, with such a construction, the fire box could not be said to be a closed one. It is not, as appellant's, operatable so as to control draft and gases. Appellant says:

"Surrounding and extending below the tube is a circular fire box, which has a top, the said top being provided with an opening therein, of substantially the size of the largest part of the tapering tube through which opening projects said tube, and by which the draft and gases are controlled."

"Referring to the particular features of my device, which are instrumental in producing carbon monoxid gas, it will be noted that I have a combustion chamber which is entirely inclosed, except that provision is made for free entrance of air below the reticulated bottom thereof and a restricted draft opening is provided at the top, which may be regulated to control the exhaust of gases therefrom."

But more significant as a distinguishing factor is the effect of the opening in appellee's structure. Bearing in mind patentee was answering the Patent Office's demand for particularity as to means whereby $CO_1$ was generated and distributed, he pointed out the advantages of a closed fire in his amended specifications as heretofore quoted. In other words, by stressing what patentee was so vigorously stressing before the Patent Office, we find ample support for a finding of noninfringement.

The mere fact that the top of appellee's fire pot is composed of two pieces, one overlapping the other, would not necessarily avoid infringement of the type disclosed in the patent and described in the claims, if mere type or form of structure were the only factor to be considered. But we are here considering a charcoal burner and monoxid generator as one structure, and we must examine the two structures for the purpose of determining whether their differences are merely a matter of type or form or whether they affect the monoxid producing qualities of the burner. Certainly the most that could be said of appellee's burner is that its construction in so far as it deviates from appellant's tends to discourage and avoid the production of monoxid gas.

A further difference between the two structures may be found in the means for conveying air to the fire. Both, of course provide for some outside air entering the ash pit and providing draft. But appellee also permits some air to pass directly to a point above the fire yet within the box. To this extent it is a retardant rather than an inciter of monoxid gas production. True, both structures may and doubtless will under certain conditions produce some monoxid gas, but the patent must be judged by its pretensions as a steady producer of this gas, not as an occasional or accidental producer of it. It is because one

element in the claim is a factor that assists in the production of this gas, and was inserted in the claims because of its influence, and a differently constructed means is a deterrent so far as it acts at all, that we find support for the finding of noninfringement.

There was conducted an experiment before trial, the results of which were given in evidence, and appellant submits them as proof of infringement. In other words, he claims the two structures are similar because of similarity of results; that is, both generate $CO_1$ in constant and sufficient quantities. We are not impressed by the proof. Upon appellant was the burden of proving infringement. It could have conducted its experiment in a box car or in a similarly constructed and similarly ventilated structure. Instead, it took an air-tight box, 4x4x5 containing but 80 cubic feet of air. Oxygen content was reduced from 19.2 to 6.7 cubic feet before the experiment began. The period of time covered by the experiments was not the same. Appellant's structure was in the box one hour, while appellee's was used but 46 minutes. The $CO_1$ in the box when appellant's test began was .96, and increased to 1.61 per cent., and showed a steady increase. Meanwhile the oxygen was reduced. When the experiment with appellee's burner began, the $CO_1$ was 1.44 cubic feet and rose in 23 minutes to 2.24, and during the second 23 minutes fell to 1.60, or nearly 50 per cent. During the same period, the $CO_2$ steadily increased, while in appellant's case it remained about even.

While no very satisfactory deductions may be drawn from this experiment, it is at least suggestive that had the experiment with appellee's burner continued even for an hour, the decrease in $CO_1$ would have been such as to entirely eliminate it as a sustained producer of that gas such as patentee described in his invention and claimed his structure to be. Certainly, to determine whether a burner is a $CO_1$ generator, it was hardly fair to reduce the oxygen content of the air. as here shown. Moreover, an air-tight structure would be far more likely to result in $CO^1$ production than would a car which admitted air as freely even as the ordinary refrigerator car. The record is not silent as to the construction of a refrigerator car, and it appears that in all such refrigerator cars fresh air is constantly admitted.

We cannot escape the conclusion that the experiment, instead of furnishing proof of infringement, is rather suggestive, if not persuasive, of the fact that appellee's burner, under conditions existing in the ordinary box car into which some air could pass, would not be a constant producer of $CO_1$, but the combustion would be sufficiently complete to distinguish it from the patent. This impression is confirmed by other facts disclosed by the record. Carbon monoxid is odorless, yet extremely poisonous. When inhaled in considerable quantity, it is fatal. This dangerous poison could not be safely allowed to circulate in a refrigerator car without warning notices. Individuals who entered the car at the destination or elsewhere would be overcome by it if produced in the quantities charged against appellee's burner. Notwithstanding this danger, it appears that appellee used its burners without warning and without any record of fatal consequences.

This conclusion of noninfringement is further strengthened by the

presumption which the dismissal of the bill by the District Court creates. We may assume, nothing appearing to the contrary, that the dismissal was on the ground of noninfringement. The weight to be given the experiments in this case depended in part upon the impression created by the witnesses who testified in open court. To a certain extent, therefore, credibility entered into the finding.

We conclude infringement is not established. The decree is affirmed.